Filed 3/12/25  P. v. Stamps CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SANTANA STAMPS,<br><br>    Defendant and Appellant. | B332692<br><br>(Los Angeles County<br>Super. Ct. No. BA493194) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Santana Stamps appeals from the judgment after a jury convicted him of first degree murder; attempted willful, deliberate, and premeditated murder; and attempted robbery. Stamps argues the trial court erred in (1) admitting evidence of case-specific testimony from a deputy medical examiner who did not perform the autopsy of the murder victim; (2) admitting evidence of case-specific testimony from a detective who did not perform the ballistics testing of a gun that matched casings recovered at the scene of the murder; and (3) instructing on aiding and abetting liability for felony murder. We conclude Stamps's arguments are forfeited, meritless, or both. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Stamps Goes on a Shooting Spree*

At 11:00 a.m. on December 15, 2020 Stamps, who was 18 years old, got out of a car driven by Christyen Holmes at Harvard Boulevard and 27th Street in Los Angeles and fired shots at M.B.'s car. Bullets hit the trunk and a back tire of M.B.'s car, but did not hit M.B.

Holmes drove Stamps to Melrose Avenue, where the two men got out of the car. At 12:55 p.m. Stamps fired his gun at Devonte Clepper and his younger brother K.C., both of whom had just walked out of a shoe store. Clepper died from a gunshot wound to his chest; K.C. sustained bullet wounds to his head, torso, and hand and lost a finger and a portion of his intestine. Next to Clepper's body on the street was a box of tennis shoes.

Five minutes later, as Stamps and Holmes fled the Melrose Avenue crime scene in their car, Holmes hit a parked car on La Brea Avenue.  An hour or so later, Stamps and Holmes abandoned their car on a nearby street.

B.      *Witnesses Testify at Trial About the Shootings*

M.B. testified that, while he was driving in the vicinity of Harvard Boulevard and 27th Street, he saw two Black "dudes" standing outside a white car shoot at his car.  M.B. stated, however, he did not see "who did the shooting."

K.C. testified that he, his older brother, and a friend went to Melrose Avenue to buy clothes and shoes to wear in a music video.  K.C. stated that he had no memory of the shooting, that he could only remember getting into the car to go to Melrose Avenue, and that the next thing he remembered was an officer attending to his wounds from the shooting and then waking up in a hospital.  After watching a video showing K.C. and his two companions on Melrose Avenue, K.C. recalled that, right before the shooting, they were shooting basketballs at a shoe store.

Two eyewitnesses to the shooting on Melrose Avenue described the shooter.  Charles Hailey testified he was at a store on Melrose Avenue when he heard "close to half a dozen . . . pops" that sounded like a "really loud firecracker or a backfire from a car."  Hailey dove to the ground and "shimmy-crawled away" from the window.  When Hailey got to the other side of a wall in the store, he looked out to the street and observed "a lot of commotion."  Hailey stated that he saw two people running and that the person who had a gun in his hand was wearing a "grayish-colored sweatshirt."  Describing the race of the gunman,

Hailey said, "I want to say Black, but I don't think he was like really dark."

Brooke Pickens testified that, at 12:55 p.m., she was parked on Melrose Avenue, waiting for an appointment, when she heard three gunshots. Pickens stated she ducked, looked up, and saw people running. Pickens said she saw a "thin build" Black male, between five feet seven inches and five feet 10 inches, who was wearing a gray sweatshirt and jeans, running "toward a car" with a gun in one hand and a shoe box in another hand.[1] Pickens said the gunman and one or two other people were running "like a group that [was] together."

A police officer testified he found six .40-caliber Smith & Wesson casings at the scene of the first shooting. Another officer testified he found nine .40-caliber Smith & Wesson casings at the scene of the second shooting.

James Gray testified that, at 1:00 p.m. on the day of the shootings, he was parked on La Brea Avenue when a white car hit his car on the driver's side. Gray stated that he followed the white car and that, as he followed the car, he took a picture of the car and its occupants. According to Gray, the driver stopped at a nearby parking lot and gave Gray his insurance card, which showed the insured's name was "Christyen Holmes."

Los Angeles Police Department Detective Tyler Adams narrated surveillance video obtained from several locations. One

---

[1] The parties stipulated that, when police officers arrested Stamps two months after the shootings, he was five feet eight inches tall and weighed 130 pounds. A police detective stated that Holmes was approximately five feet nine inches tall and weighed approximately 160 to 165 pounds and that Holmes was "definitely bulkier" than Stamps, who was "significantly thinner in build."

video showed that, approximately 40 minutes after the shooting on Harvard Boulevard, Stamps and Holmes pulled into a gas station on Topanga Canyon Boulevard, where both men got out and went inside the convenience store. Another video showed that, at approximately 12:55 p.m., an individual wearing a gray "hoodie with the hood up" and black pants, and a second individual with a yellow hoodie and light-colored pants, got out of a white car that had just pulled up to the curb on Melrose Avenue near Stanley Avenue. The video showed (1) the two individuals walking toward Stanley Avenue, (2) as they approached the corner, a person "wearing all black" who was standing on the corner falling to the ground, and (3) the two people with hoodies running back toward the white car. A series of videos showed the white car pulling into the street, driving west on Melrose Avenue, and then heading east, toward La Brea Avenue. Referring to the picture Gray took of the driver and passenger of the white car that collided with his car on La Brea Avenue, Detective Adams confirmed the picture depicted Holmes as the driver and Stamps "as the passenger."

Detective Adams testified that, when he searched Stamps's home, he found in the bedroom closet a gray hoodie with a logo of a major American manufacturer of athletic shoes and apparel and "the same distinctive markings" he saw in the surveillance videos. Inside the car Stamps and Holmes abandoned on the street, Detective Adams found a receipt dated December 15, 2020 from the gas station on Topanga Canyon Boulevard, a doctor's note with Stamps's name on it, and a parking citation issued on the street in front of Stamps's house.

A Federal Bureau of Investigation agent testified that, on the day of the shootings, records of cell phone towers tracked the

5

cell phones belonging to Stamps and Holmes at the following locations during the relevant time periods: the vicinity of the first shooting on Harvard Boulevard and 27th Street, at approximately 11:00 a.m.; the gas station at Topanga Canyon Boulevard, between 11:39 a.m. and 11:55 a.m.; the site of the traffic collision on La Brea Avenue, between 1:02 p.m. to 1:17 p.m.; and the area where law enforcement found the abandoned white car between 1:26 p.m. and 1:49 p.m.  The cell towers did not detect a location for Stamps's cell phone at the time period of the shooting on Melrose Avenue (12:55 p.m.), but the cell towers tracked Holmes's cell phone in the vicinity of the second shooting at approximately 12:30 p.m.

C.     *A Jury Convicts Stamps, and the Trial Court Sentences Him*

The jury convicted Stamps of first degree murder (Pen. Code, § 187, subd. (a));[2] attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664, subd. (a)); and attempted robbery (of Clepper) (§§ 211, 664).  The jury found Stamps not guilty of shooting at an occupied motor vehicle (the Harvard Boulevard shooting) (§ 246) and attempted robbery (of K.C.) (§§ 211, 664).  The trial court sentenced Stamps to a prison term of 25 years to life for the murder conviction, a term of life (with a minimum parole eligibility of seven years) for the attempted murder conviction, and two years for the attempted robbery conviction (although the court stayed execution of the two-year term under section 654).  Stamps timely appealed.

---

[2]     Undesignated statutory references are to the Penal Code.

6

# DISCUSSION

### A. *Stamps's Argument the Trial Court Erred in Admitting Testimony by the Deputy Medical Examiner: Forfeited and No Prejudice*

Stamps argues that the trial court erred in admitting the testimony of Dr. Paul Gliniecki, a deputy medical examiner who related case-specific facts from an autopsy report he did not write, and that the court's error violated state hearsay rules and Stamps's federal rights under the confrontation clause of the Sixth Amendment. Stamps argues this portion of Dr. Gliniecki's testimony constituted "prejudicial error" because it "was an essential part of the prosecutor's interpretation of the video footage." Stamps, however, forfeited this argument by not objecting at trial, and even if he had not, any Sixth Amendment violation was harmless beyond a reasonable doubt.

### 1. *Relevant Proceedings*

Dr. Gliniecki testified that he did not conduct the autopsy of Clepper and that Dr. Zuhha Ashraf, the medical examiner who conducted the autopsy, no longer worked at the medical examiner's office. Dr. Gliniecki stated that he reviewed Dr. Ashraf's autopsy report and the photographs Dr. Ashraf took during the autopsy and that Dr. Gliniecki concluded the cause of Clepper's death was homicide caused by a gunshot wound to the torso. Dr. Gliniecki said he disagreed with Dr. Ashraf's finding a bullet entered Clepper's chest because, in Dr. Gliniecki's opinion, the "characteristics of the wound" indicated Clepper sustained an "entry wound to the back." Dr. Gliniecki, however, qualified his testimony: "I can't disagree with what Dr. Ashraf said. It's

7

possible that could have been an entrance [wound], but I lean more towards it being an exit.  But unless I was actually there, it's difficult for me to make that assumption."  Gliniecki confirmed an entrance wound into the chest meant Clepper "had to be facing the shooter."

2.      *Applicable Law and Standard of Review*

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'  [Citation.] 'Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain.'  [Citation.]  Hearsay evidence is generally inadmissible unless it satisfies a statutory exception." (*People v. Turner* (2020) 10 Cal.5th 786, 821; see Evid. Code, § 1200, subds. (a), (b).)

"When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.  If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. omitted (*Sanchez*); see *Crawford v. Washington* (2004)

541 U.S. 36, 59; *People v. Garton* (2018) 4 Cal.5th 485, 505 (*Garton*).)[3]

The admission of "'autopsy *photographs,* and competent testimony based on such photographs, does not violate the confrontation clause,'" and "an expert may rely on hearsay in forming an opinion and may tell the jury in general terms that she did so." (*Garton*, *supra*, 4 Cal.5th at p. 506; see *People v. Gonzales* (2019) 34 Cal.App.5th 1081, 1089-1090.) However, the testimony of an expert that relates out-of-court statements by a nontestifying witness is hearsay. (*Garton*, at p. 506; see Evid. Code, § 1200, subd. (a).)

Improper admission of hearsay "may constitute state law statutory error." (*Sanchez*, *supra*, 63 Cal.4th at p. 698.) "State law error in the admission of hearsay requires reversal of the judgment if "'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.'"" (*People v. Turner*, *supra*, 10 Cal.5th at p. 823; see *People v. Watson* (1956) 46 Cal.2d 818, 837.) But where the hearsay "was testimonial," the People must show "that any confrontation error was harmless beyond a reasonable doubt." (*Sanchez*, at pp. 698-699; accord, *People v. Gonzalez* (2021) 12 Cal.5th 367, 398; see *Chapman v. California* (1967) 386 U.S. 18, 24.) "Violation of the Sixth Amendment confrontation right requires reversal of the judgment against a

_____

[3]     "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez*, *supra*, 63 Cal.5th at p. 689.)

criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless." (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661; see *Gonzalez*, at p. 398 [confrontation clause error is harmless where ""'it [is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error'""].)

> 3. *Stamps Forfeited His Argument the Trial Court Erred in Admitting Testimony by the Deputy Medical Examiner, and Any Error Was Harmless*

"Ordinarily, 'the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted.' [Citations.] "'The reason for the [objection] requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'"" (*People v. Perez* (2020) 9 Cal.5th 1, 7; see Evid. Code, § 353, subd. (a); *People v. Espinoza* (2018) 23 Cal.App.5th 317, 320.) By not objecting at trial to Dr. Gliniecki's testimony about Dr. Ashraf's statements, Stamps forfeited his argument the court erred in admitting the portion of Dr. Gliniecki's testimony Stamps complains about on appeal. (See *Perez*, at p. 7; *Espinoza*, at p. 320.)[4]

---

[4] Stamps argues in the alternative his trial counsel provided ineffective assistance by not objecting to Dr. Gliniecki's

10

Forfeiture aside, any error in admitting Dr. Gliniecki's testimony about Dr. Ashraf's statements was harmless beyond a reasonable doubt. The trial court did not err in admitting the portion of Dr. Gliniecki's testimony that described Clepper's wounds or that gave his opinions about the trajectory of the bullets. According to Dr. Gliniecki, he based these opinions on the autopsy report and photographs. Admission of this testimony did not violate the hearsay rule or the confrontation clause. (*Garton*, *supra*, 4 Cal.5th at p. 506; see *People v. Dungo* (2012) 55 Cal.4th 608, 619 [statements describing "anatomical and physiological observations about the condition of the body" are "not testimonial in nature"].)

But Dr. Gliniecki also testified Dr. Ashraf concluded Clepper's gunshot wound to the chest was an entry wound. That portion of Dr. Gliniecki's testimony was hearsay. (See *Garton*, *supra*, 4 Cal.5th at p. 506.) To the extent Dr. Gliniecki's statement relating Dr. Ashraf's conclusion constituted testimonial hearsay (see *ibid.* [assuming, without deciding, an expert's statement that conveyed conclusions of a nontestifying

_____

testimony. "To obtain relief for ineffective assistance of counsel, a defendant must show both deficient performance 'and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different.'" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 753; see *People v. Rices* (2017) 4 Cal.5th 49, 80.) The test for prejudice "is essentially the same standard applied in reviewing state evidentiary error under . . . *Watson*." (*People v. Xiong* (2020) 54 Cal.App.5th 1046, 1068, fn. 11.) Because (as we discuss next) any error in admitting this portion of Dr. Gliniecki's testimony was harmless beyond a reasonable doubt, Stamps cannot show a reasonable probability that, but for his counsel's failure to object, the result of the trial would have been different.

11

expert "was testimonial"]), any error in admitting the statement was harmless beyond a reasonable doubt. (See *id.* at p. 507; *Sanchez, supra*, 63 Cal.4th at p. 698.)

The principal issue at trial was the identity of the shooter. The prosecutor argued the witnesses' descriptions, Stamps's cell phone records, surveillance videos of the white car and Stamps's clothing at the gas station, Gray's picture of Stamps and Holmes in the white car, and items found in the car and Stamps's house proved Stamps was the shooter. The prosecutor did not use any evidence of Clepper's wounds to link Stamps to the shooting. Although the prosecutor stated Stamps shot Clepper as he was running away (to describe how the shooting occurred), counsel for Stamps did not dispute this characterization of the shooting or refer to how Clepper died, and focused instead on the prosecution's failure to prove Stamps was the shooter. Counsel for Stamps argued to the jury: "There is no I.D. of Stamps by any of the witnesses during the investigation. No I.D. of Stamps during the trial by any of the witnesses. No phone evidence during the Melrose Avenue shooting." Whether Clepper was shot from the front or behind was not relevant to the identity of the shooter. Given the insignificance of Dr. Ashraf's (and Dr. Gliniecki's) opinion on this point, and the considerable evidence tying Stamps to the Melrose Avenue shooting, it is "'"clear beyond a reasonable doubt"'" (*People v. Gonzalez, supra*, 12 Cal.5th at p. 398) a rational jury would have found Stamps guilty even if the court had excluded Dr. Gliniecki's testimony that conveyed Dr. Ashraf's opinion. (See *Garton, supra*, 4 Cal.5th at p. 507 [because "the state of [the victim's] body and the manner in which she died were not disputed at trial," the defendant "was not prejudiced by the introduction of [the

12

expert's] case-specific hearsay statements concerning the state of [the victim's] body and her cause of death"].)

B. *Stamps's Argument the Trial Court Erred in Admitting Ballistics Testimony by Detective Adams: Forfeited and No Prejudice*

Stamps argues the trial court erred in allowing Detective Adams to testify about the results of the ballistics tests he did not perform because his testimony "constituted case-specific out-of-court hearsay" and violated his "confrontation rights under the Sixth Amendment." Stamps, however, again forfeited this argument by not objecting at trial, and even if he had not forfeited it, the court's error was harmless.

1. *Relevant Proceedings*

Detective Adams testified that, approximately four months after the shootings, he received an email from the Los Angeles County Sheriff's Department notifying him of a "ballistics link." The detective explained deputy sheriffs recovered a gun in Lancaster that matched the cartridge casings from the two crime scenes. Detective Adams retrieved the gun and sent it to the crime laboratory for an "actual scientist" to fire the gun and determine whether it "fired the casings that matched in the system." In response to the prosecutor's question whether the scientist at the crime laboratory found the casings matched, Adams said, "Yes." Counsel for Adams objected, "Vague." The court overruled the objection.

13

### 2. *Applicable Law and Standard of Review*

As discussed, "an improper admission of hearsay would constitute statutory error under the Evidence Code," and "the admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses." (*Sanchez*, *supra*, 63 Cal.4th at pp. 685, 670; accord, *People v. Lamb* (2024) 16 Cal.5th 400, 433; see *People v. Azcona* (2020) 58 Cal.App.5th 504, 514 ["An expert is permitted to relate hearsay statements regarding general background information that contributes to his or her opinion, but not testimonial hearsay statements that present case specific facts."].) Error in the admission of hearsay under state law requires reversal if the defendant can show it is reasonably probable he would have obtained a more favorable result absent the error. (*People v. Turner*, *supra*, 10 Cal.5th at p. 823; see *People v. Hernandez* (2011) 51 Cal.4th 733, 746.) "Testimonial hearsay admitted in violation of the Sixth Amendment confrontation clause requires reversal unless the prosecution shows the error was harmless beyond a reasonable doubt." (*Azcona*, at pp. 514-515; see *Lamb*, at p. 434; *Sanchez*, at p. 698.)

### 3. *Stamps Forfeited His Argument, and the Trial Court's Error Was Harmless*

Although counsel for Stamps objected to Detective Adams's testimony about the crime laboratory's conclusion on the ground it was vague, he did not object that it was inadmissible hearsay or that it violated his Sixth Amendment rights. (See Evid. Code, § 353, subd. (a) [an objection must "make clear the specific ground of the objection"]; *People v. Abel* (2012) 53 Cal.4th 891, 924 ["appellate court's review of the trial court's admission of

evidence is . . . limited to the stated ground for the objection"].) Therefore, Stamps forfeited his argument the court erred in admitting Detective Adams's ballistics testimony. (See *People v. Perez, supra,* 9 Cal.5th at p. 7.)[5]

In any event, even if Stamps had not forfeited his argument, the trial court's error was harmless beyond a reasonable doubt. Detective Adams's statement a scientist from the crime laboratory had determined the gun found in Lancaster fired the casings from the two shootings constituted case-specific hearsay. (See *Sanchez, supra,* 63 Cal.4th at p. 684.) The out-of-court statement was also testimonial, and there was no evidence that the scientist was unavailable or that Stamps had an opportunity to examine him. Thus, Detective Adams's testimony about the ballistics test results violated Stamps's rights under state law and the Sixth Amendment. (See *Sanchez,* at pp. 686, 689.) The error, however, was harmless beyond a reasonable doubt under *Chapman.* (See also *Sanchez,* at pp. 698-699 [applying the *Chapman* standard to review whether an error in admitting testimonial hearsay was harmless].)

"'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that

---

[5] As with his argument regarding Dr. Gliniecki's testimony, Stamps argues in the alternative his trial counsel provided ineffective assistance by not objecting to Detective Adams's testimony about the results of the ballistics tests. Because the court's error was harmless beyond a reasonable doubt, Stamps cannot show a reasonable probability that, but for his counsel's failure to object, the result of the trial would have been different.

an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.]  Thus, the focus is what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error.""" (*People v. Pearson* (2013) 56 Cal.4th 393, 463; accord, *People v. Garcia* (2020) 46 Cal.App.5th 123, 179.)

As discussed, the central issue in the trial was the identity of the shooter in each shooting.  Stamps does not state how the ballistics evidence assisted the prosecution in proving he was the shooter.  Stamps only asserts that, had "the jury not heard testimony . . . the murder weapon was stashed in Lancaster, and conclusively proven to have fired the numerous bullets at the two crime scenes, it cannot be said [he] would have been convicted under the remaining circumstantial evidence."  But there was no evidence connecting the gun to Stamps; Detective Adams said he did not check the gun for fingerprints.  And nothing on the casings indicated they belonged to or came from a gun used by Stamps.  The only reason the prosecution introduced the ballistics evidence was that, because the casings found at the two shootings came from the same gun, if the evidence showed beyond a reasonable doubt Stamps was the shooter in one shooting, the ballistics evidence would tend to show he was also the shooter in the other shooting.  But the jury acquitted Stamps of the charge relating to the Harvard Boulevard incident (shooting at M.B.'s occupied vehicle).  The prosecution failed to convince the jurors that, if Stamps was the shooter in the second

16

shooting, he was the shooter in the first.[6]  Thus, as the People argue, "the jury's findings show that the jury did not give the [ballistics] evidence any weight whatsoever."  The guilty verdicts were "surely unattributable" to the confrontation clause error (*People v. Penunuri* (2018) 5 Cal.5th 126, 158) in admitting Detective Adams's ballistics testimony.  (Cf. *People v. Azcona*, *supra*, 58 Cal.App.5th at pp. 514-515 [where the description of the perpetrator in one shooting was "relatively limited," and the defendant admitted (to an informant) to killing the victim in a second shooting, the expert's testimony his supervisor "approved" his conclusion the casings found at both shootings "came from the same gun" may have contributed to the jury's verdict on the first shooting].)

Moreover, the evidence Stamps was the shooter on Melrose Avenue was strong.  Hailey and Pickens both testified that, immediately after hearing gunshots, they saw a Black man who was wearing a gray sweatshirt running with a gun; Hailey provided more detail on the shooter's complexion ("Black," but not "really dark"), and Pickens provided more detail on his body type and height.  Their descriptions matched Stamps.  In addition, approximately one hour before the Melrose Avenue shooting, surveillance video showed Stamps was wearing a gray sweatshirt

---

[6]  Nor did evidence from the first shooting assist the prosecution in proving the identity of the shooter in the second shooting.  M.B. (the victim in the Harvard Boulevard shooting) did not provide any identifying information about the shooter, other than the race of the shooter and the color of his car.  The evidence in the Melrose Avenue shooting, namely the video surveillance of the street and the witnesses' descriptions, already included that information.

at the gas station on Topanga Boulevard and getting into the front passenger seat before the car drove away. Detective Adams testified Stamps was in the front passenger seat of the white car in a picture taken on La Brea Avenue five minutes after the shooting,[7] and the detective found a gray sweatshirt in Stamps's closet and paperwork that belonged to Stamps inside the abandoned white car. That casings from a shooting the jury found Stamps did not commit matched the casings found on Melrose Avenue was "unimportant" (*People v. Pearson*, *supra*, 56 Cal.4th at p. 463) in relation to all the other evidence the jury considered. Indeed, the prosecutor did not even refer in closing argument to the ballistics evidence. (See *People v Penunuri*, *supra*, 5 Cal.5th at p. 180 ["The extent to which the prosecution relied on improperly admitted evidence proves pivotal in assessing '"what the jury actually decided and whether the error might have tainted its decision."'"].)

C. *Stamps's Argument the Trial Court Erred in Instructing the Jury on Aiding and Abetting Felony Murder: Forfeited, No Error, and No Prejudice*

Stamps argues the trial court erred in omitting from the jury instruction on felony murder the factors the Supreme Court set forth in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) for assessing whether the defendant acted with reckless indifference to human life. Stamps asserts including those factors in the instruction on felony murder would have helped "guide the jury in undertaking the assessment." Stamps also argues the court's

_____

[7] Surveillance video also showed the white car the shooter returned to after committing the crimes traveled toward La Brea Avenue.

instruction on felony murder also failed to instruct the jury "on the requirement of considering the *Miller* factors in assessing [his] culpability for first degree felony murder."[8]  These arguments, too, are forfeited; they also fail on the merits, and any error was harmless.

> 1.  *Relevant Proceedings*

The trial court instructed the jury on murder with CALJIC No. 8.10, malice with CALJIC No. 8.11, the elements of first degree murder with CALJIC No. 8.20, and the principles of aiding and abetting liability with CALJIC Nos. 300 and 301.  The court also instructed the jury on felony murder with CALJIC No. 8.21:  "The unlawful killing . . . by a defendant of a human being, whether intentional, unintentional, or accidental, . . . which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit robbery."

The court's instruction pursuant to CALJIC No. 8.21 included an instruction on aiding and abetting felony murder:  "A defendant who aided and abetted . . . the actual killer in the commission or attempted commission of the crime of robbery is not guilty of first degree murder unless he acted with the specific

---

[8]  In *Miller v. Alabama* (2012) 567 U.S. 460 the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'" and that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," including "their age and age-related characteristics and the nature of their crimes."  (*Id*. at pp. 465, 489.)

intent to kill during the commission or attempted commission of the crime of robbery or was a major participant in the crime of robbery and acted with a reckless indifference to human life." The court told the jurors that, in determining "whether a defendant as an aider and abettor was a major participant to a first degree felony murder," they should "consider the totality of the circumstances surrounding the commission of the crime," and the court listed six factors for the jury to consider. Finally, the court read the jury an instruction on "reckless indifference": "A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being. By participating in a violent felony with lethal weaponry, one should reasonably foresee blood is a possibility. However, awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient. Only knowingly creating a grave risk of death is sufficient."[9] Counsel for Stamps did not object to these instructions.

During closing argument counsel for Stamps referred to the jury instruction on aiding and abetting and stated: "This has to do with a person [who] aids and abets in the commission or attempted commission of the crime. I don't really think that applies because the People are trying to say that . . . Stamps did

_____

[9] The trial court also gave the jury the written form of CALJIC No. 8.21, which states, in relevant part, "By participating in a violent felony with lethal weaponry, one should reasonably foresee that bloodshed is a possibility." (See *People v. Frederickson* (2020) 8 Cal.5th 963, 1026 ["'[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.'"].)

20

both of the shootings and the attempted murder himself, but there is no evidence of . . . Stamps being an aider or abettor, no evidence of an intent to commit a crime, no evidence of help or to further the crime. He was a passenger in the car, never a driver." Other than this comment, counsel for Stamps focused his argument almost exclusively on the lack of evidence linking Stamps to either of the two shootings and did not discuss whether Stamps was a major participant or acted with reckless indifference to human life as an aider and abettor to felony murder. The prosecutor told the jury in her closing argument that "it would be unreasonable to conclude that anyone else other than [Stamps] was the shooter" and that "everything points to [Stamps] actually being the shooter," but she added that, if the jury were to consider the question whether Stamps aided and abetted, the answer would be, "Absolutely." The prosecutor explained Stamps was "the one that got the car that was used in all of these crimes."

### 2. *Applicable Law and Standard of Review*

"In a criminal case, a trial court has a duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. The general principles of law governing the case are those principles connected with the evidence and which are necessary for the jury's understanding of the case. As to pertinent matters falling outside the definition of a general principle of law governing the case, it is defendant's obligation to request any clarifying or amplifying instruction." (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*), internal citations and quotation marks omitted; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 385.) The "'language of a statute defining a crime

21

or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.  If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.'" (*Estrada*, at p. 574; accord, *People v. Ramirez* (2021) 10 Cal.5th 983, 1001.)

Section 189, subdivision (a), provides murder "committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping," or other specified offenses not relevant here, "is murder of the first degree."  (See *People v. Wilson* (2023) 14 Cal.5th 839, 868; *People v. Lopez* (2023) 88 Cal.App.5th 566, 574.)  Under section 189, subdivision (e), a "participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (See *People v. Arellano* (2024) 16 Cal.5th 457, 467-468; *People v. Superior Court (White)* (2025) 107 Cal.App.5th 1268, 1274-1275.)

Section 190.2 prescribes the penalty where the jury finds true a special circumstance allegation, including the special circumstance the murder "was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" one of 12 enumerated

felonies, one of which is robbery.  (§ 190.2, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 704 (*Strong*).)  Section 190.2, subdivision (d), states that, if the jury finds true the felony-murder special circumstance allegation, the prescribed penalty shall apply to "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in . . . subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor."  (See *Strong*, at p. 704.)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) the Supreme Court held that section 190.2, subdivision (d), which codifies language from United States Supreme Court cases on "death sentences for those guilty of felony murder as accomplices," looks "to whether a defendant has '"knowingly engag[ed] in criminal activities known to carry a grave risk of death."'"  (*Banks*, at pp. 799, 801.)  The United States Supreme Court held:  "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Id.* at p. 801.)  In *Clark*, *supra*, 63 Cal.4th 522 the California Supreme Court set forth factors for courts to consider in determining whether the defendant exhibited "reckless indifference to human life."[10]  (*Id.*

---

[10]     The factors are:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime

at p. 618.)  The Supreme Court cautioned, however, "'[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'"  (*Ibid*.)  The Supreme Court did not hold a trial court had a sua sponte obligation to instruct on these factors.

"We review a claim of instructional error de novo."  (*People v. Thomas*, *supra*, 14 Cal.5th at p. 382; see *People v. Myles* (2023) 89 Cal.App.5th 711, 728.)  We evaluate "'"'the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]'"  [Citation.]  "'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.'"'"  (*Thomas*, at p. 382; see *Myles*, at p. 729.)

>    3.    *Stamps's Argument Is Forfeited, the Trial Court*
>          *Did Not Err in Instructing the Jury with*
>          *CALJIC No. 8.21, and Any Error Was Harmless*

Because Stamps did not object to CALJIC No. 8.21 as given by the trial court, he forfeited his argument the instruction was erroneous because it did not include the *Clark* factors that courts consider in determining whether the defendant acted with reckless indifference to human life.  (See *Sanchez*, *supra*,

---

or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677; see *Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

63 Cal.4th at p. 461; *People v. Lee* (2011) 51 Cal.4th 620, 638; see also *People v. Howard* (2024) 104 Cal.App.5th 625, 660 ["'failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal'"].)  But even if Stamps had not forfeited the argument, it lacks merit.

"There is no authority requiring that a jury be instructed sua sponte on the various *Clark* factors."  (*People v. Superior Court (White), supra*, 107 Cal.App.5th at p. 1277; see *Estrada, supra*, 11 Cal.4th at pp. 575, 579 [where the jury is "instructed in the language" of section 190.2, subdivision (d), the "trial court does not have a sua sponte duty to further amplify 'reckless indifference to human life'"]; *People v. Price* (2017) 8 Cal.App.5th 409, 444 (*Price*) [same]; see also *Strong, supra*, 13 Cal.5th at pp. 719-720 [the "mandatory instructions" on the felony-murder special circumstance did not change after *Banks* and *Clark*, but defense counsel may ask the court to instruct the jury on the relevant factors]; *People v. Farfan* (2021) 71 Cal.App.5th 942, 956 [jury's true finding on the felony-murder special circumstance under CALCRIM No. 703,[11] which did not include the *Clark*

_____

[11] CALCRIM No. 703, which instructs the jury on the elements of special-circumstance felony murder, includes the following language the court may give, "if requested": "A person *acts with reckless indifference to human life* when he or she engages in criminal activity that a reasonable person would know involves a grave risk of death and he or she knows that the activity involves a grave risk of death."  The bench notes state that, while the court does not have a sua sponte duty to instruct on the factors under *Banks, supra*, 61 Cal.4th 788 and *Clark, supra*, 63 Cal.4th 522, the court "should determine" whether the factors "need be given."  (Judicial Council of Cal., Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 703; see *People v.*

factors, established the defendant was ineligible for resentencing relief under section 1172.6].)

In giving CALJIC No. 8.21, the trial court tracked the language of section 189, subdivision (e), by instructing the jury that, to find Stamps guilty as an aider and abettor to felony murder, the jury had to find that he had the specific intent to kill or that he was a major participant and exhibited "reckless indifference to human life." Defining the latter requirement, the court told the jury it had to find Stamps knew or was aware his acts involved "a grave risk of death." This definition essentially restated the language in *Banks* the defendant must be indifferent to the "significant risk of death" created by his or her actions. (*Banks*, *supra*, 61 Cal.4th at p. 801; see CALJIC No. 8.21 (Spring 2023).) The court also told the jury an awareness of the risk of death "inherent in any armed conflict" was insufficient, an instruction that followed the Supreme Court's statement in *Clark* that defendants "'who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at p. 618; see CALJIC No. 8.21, *supra*.) The trial court adequately instructed the jury on the meaning of reckless indifference to human life. (See *Estrada*, *supra*, 11 Cal.4th at p. 578 ["the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony"]; *Price*, *supra*, 8 Cal.App.5th at p. 444

_____

*Farfan*, *supra*, 71 Cal.App.5th at p. 955 ["CALCRIM No. 703 now includes a list of the *Banks* and *Clark* factors which may be given in the trial court's discretion."].)

[trial court's definition of "'reckless indifference to human life' as 'knowingly engag[ing] in criminal activity that he or she knows involves a grave risk of death'" was "one that a jury may reasonably be expected to understand"].)

Stamps argues that, by failing to instruct the jury on the *Clark* factors, the trial court did not "convey that a finding of reckless indifference to human [life] required that [he] (1) was aware of and willingly involved in the violent manner in which the target felony was committed, and (2) personally harbored a willingness to kill to achieve the goal of the target offense." As discussed, however, the phrase "reckless indifference to human life" in CALJIC No. 8.21 communicated to the jury that Stamps had to be subjectively aware the underlying felony entailed grave risk to human life. (See *Estrada*, *supra*, 11 Cal.4th at p. 578.) CALJIC No. 8.21 also told the jury that someone who participates in a violent felony with lethal weapons should foresee bloodshed is possible. Stamps does not cite any authority that required the trial court to say more.

With respect to Stamps's argument "it must be proven that the defendant personally harbored a willingness to kill," that finding is encompassed in the jury's finding he acted with reckless indifference to human life. (See *Clark*, *supra*, 63 Cal.4th at p. 617 [the "mens rea" of "'reckless indifference'" "encompasses a willingness to kill"]; *Price*, *supra*, 8 Cal.App.5th at p. 451 ["neither [*Banks* nor *Clark*] compels a more explicit jury instruction on particular factors or facts that must be proven to establish [the defendant's] culpability" under section 190.2, subdivision (d)].) And the *Clark* factors do not include the requirement the defendant personally harbored a willingness to kill. (*Clark*, at p. 618.) Contrary to Stamps's assertion the trial

27

court's instruction failed to "define a 'grave risk of death' to mean an 'elevated risk to human life' beyond those risks inherent in any armed robbery," CALJIC No. 8.21 told the jury that it had to find Stamps had an awareness of risks more than those inherent in any armed crime and that only an awareness of a grave risk of death sufficed.

In his reply brief Stamps asserts "the omission of the *Clark* factors from the court's instruction on the legal standard of reckless indifference to human life rendered the instruction legally inaccurate," but he does not identify the inaccuracy. He suggests the CALJIC instructions the trial court gave were insufficient because the CALCRIM instructions, unlike the CALJIC instructions, include the *Clark* factors. The latter assertion, however, is not entirely accurate. CALCRIM No. 540B, which states the elements of aiding and abetting felony murder, and CALCRIM No. 540C, which states the elements of felony murder where other acts (e.g., a heart attack) allegedly caused the victim's death, do list the *Clark* factors, but they are in brackets as something the jury "may" consider. (Judicial Council of Cal., Crim. Jury Instns. (2024).) As with CALCRIM No. 703, the bench notes for CALCRIM Nos. 540B and 540C state that the court does not have a sua sponte duty to give the *Clark* factors and that the court "should determine" whether to give them. (Bench Notes to CALCRIM Nos. 540B and 540C.)

Finally, any error in the trial court's instructions on aiding and abetting felony murder was harmless. When the court instructs on two theories of guilt, "one correct and the other incorrect," the "usual 'beyond a reasonable doubt' standard of review established in *Chapman* . . . for federal constitutional error applies." (*People v. Aledamat* (2019) 8 Cal.5th 1, 7, 3; see

28

*People v. Powell* (2021) 63 Cal.App.5th 689, 714.) "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, at p. 13; see *Powell*, at p. 715.) "Courts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless." (*Powell*, at p. 715; see *Aledamat*, at p. 14 [arguments of counsel supported the conclusion the jury did not misapply the court's instructions].) Here, the prosecutor's primary argument was that Stamps was guilty as the actual shooter; she made only a passing reference to Stamps's possible role as an aider and abettor, and she did not mention whether he acted with reckless indifference to human life. Counsel for Stamps argued the instruction on aiding and abetting did not apply, and he focused his closing argument on the prosecution's failure to prove the identity of the shooter. (See *Powell*, at pp. 715-716 ["given that the jury was never steered in [the] direction" of applying an erroneous theory of murder, "it is clear the jurors were persuaded by one or both of the prosecutor's arguments" of the defendant's guilt under legally valid theories].)

Nor did the evidence support Stamps's guilt as an aider and abettor. Both eyewitnesses testified the gunman wore a gray sweatshirt. Video surveillance at the Topanga Canyon gas station showed Stamps wearing a gray sweatshirt, the front passenger of the car that hit Gray's car on La Brea Avenue (five minutes after the Melrose Avenue shooting) wore a gray sweatshirt, and Detective Adams found a gray sweatshirt hanging in Stamps's closet. There was no evidence to support the theory Holmes may have been the shooter (and Stamps was the

driver and was guilty as an aider and abettor): Holmes was not wearing a gray sweatshirt on the day of the shootings and did not match the Melrose Avenue witnesses' description of the shooter. (Cf. *People v. Mil* (2012) 53 Cal.4th 400, 417 [because the defendant "contested whether he acted with reckless indifference to human life," and "the record support[ed] a reasonable doubt as to that element," the omission of two elements from the instruction on the felony-murder special circumstance was prejudicial].)

D. *Stamps's Argument the Trial Court Erred in Failing To Instruct the Jury To Consider His Youth: Forfeited, No Error, and No Prejudice*

As with his argument the trial court erred in instructing the jury on reckless indifference to human life without listing the *Clark* factors, Stamps forfeited his argument the court erred in instructing the jury without telling the jurors that they should consider his youth when determining whether he acted with reckless indifference to human life: Stamps did not object to the jury instruction in the trial court. (See *People v. Jackson* (2016) 1 Cal.5th 269, 336 ["'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.'"]; *People v. Howard*, *supra*, 104 Cal.App.5th at p. 660 [same].) Even if not forfeited, however, the argument lacks merit.

As discussed, the trial court did not have a sua sponte duty to list the *Clark* factors when instructing the jury on how to determine whether the defendant exhibited reckless indifference

to human life.  (See *Strong*, *supra*, 13 Cal.5th at pp. 719-720.) Nor did the trial court have a duty to instruct the jury to consider the defendant's youth in making this determination.  The cases Stamps cites to support his argument "the youth factors must be considered in assessing whether a youthful offender was a major participant and acted with reckless indifference to human life" all arose in the context of a petition for writ of habeas corpus challenging the sufficiency of the evidence on the felony-murder special circumstance finding or a petition for resentencing under 1172.6, where the superior court was considering whether a defendant is eligible for resentencing.[12]  None of these cases involved whether the trial court has a sua sponte duty to instruct on the *Banks*/*Clark* or youth factors in connection with aiding and abetting felony murder.

---

[12]     See *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093 ("it is best for the trial court to have a meaningful opportunity to consider [the defendant's] youth as part of the totality of the circumstances germane to determining whether he was a major participant who acted with reckless indifference to human life"); *In re Harper* (2022) 76 Cal.App.5th 450, 470 (declining to decide whether "youth is a factor that *must* be considered whenever the *Banks*/*Clark* analysis is conducted for a defendant who was a minor at the time of the offense"); *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 987 ("'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life'"); *In re Moore* (2021) 68 Cal.App.5th 434, 454 (same); *People v. Harris* (2021) 60 Cal.App.5th 939, 960 ("given [the defendant's] youth . . . , particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that [he] was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants'").

31

Finally, Stamps again has not shown prejudice.  There was no evidence Stamps's youth played a role in his conduct on December 15, 2020.  (See *People v. Oliver* (2023) 90 Cal.App.5th 466, 489 ["There is no evidence in this case that [the defendant's] criminal behavior was motivated by either" his "relative impulsivity" or his "vulnerability to peer pressure."]; cf. *People v. Keel* (2022) 84 Cal.App.5th 546, 562 [evidence suggested the defendant's youth at 15 years old "may have rendered him especially vulnerable to outside pressures"].)  Nor was there evidence Stamps acted as an aider and abettor.  As discussed, the parties chiefly disputed whether the evidence showed Stamps was at the scene of the crimes, not the degree of his involvement or culpability.

**DISPOSITION**

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

FEUER, J.

32